Good morning, everyone. Welcome. Our first case for argument this morning is Ted Velleff v. Sheriff of Cook County. Mr. Flaxman, good morning. Good morning, Your Honor. May it please the Court. This case involves prisoner property. The Court has ruled on at least three other cases that involve prisoner property. This case is different. This case, the Court should find in favor of the prisoners rather than in favor of the government. The three cases that the Court has decided about detainee property all turned on the police department's problem with running out of storage space. The claim, as the Court viewed it, was that once someone is arrested and the police department inventories their property, the police department is required to hold the property forever. That's not the claim here. In this case, the property was inventoried by the police department, sent to the Cook County Jail where the sheriff it until the prisoners were ready to leave the jail. Some of the prisoners went home. Other prisoners went to the Illinois Department of Corrections. In the class period, there were about 40,000 people that left the jail and went to the Department of Corrections. The Department of Corrections follows state law and has a policy, a written policy of which it has advised the sheriff that we will accept and hold until the prisoner leaves our custody government-issued identification. When does the constitutional harm happen? It happens when we consider the Fourth Amendment, which recognizes personal property, the Fifth Amendment, and the Fourteenth Amendment, which also recognizes all property. Is it taken under the Fourth Amendment or does the harm happen under the Fourth Amendment at the time of the arrest? No, the taking occurs when it's destroyed. That's the Fifth Amendment claim. Just start with the Fourth Amendment. The Fourth Amendment claim, this Court's jurisprudence has consistently said the Fourth Amendment is limited to the instantaneous taking of property or taking of a person. The Supreme Court rejected that most recently in Thompson, where they said if you're arrested and held for four hours, I think, in Thompson, you can then bring a Fourth Amendment malicious prosecution claim two years later when the criminal case is resolved in your favor, even if you're released after that four hours. So this Court's jurisprudence limiting the Fourth Amendment to the instantaneous taking is wrong. And the Court was confronted with that when a case was vacated and remanded in light of Thompson. I think that's, I don't remember the name. But how does that affect the abandonment? How does that affect the abandonment rationale of all of our prior cases? The abandonment argument... Because the decisions you're referring to are statute of limitations decisions. I'm having trouble hearing you. The decisions you're referring to, Manuel, et cetera, those are statute of limitations questions? No, those are accrual. Accrual, right, for limitations purposes. But they were accrual, but a Fourth Amendment claim, it's no longer correct to say that a Fourth Amendment claim accrues at the time of the taking. But we don't have that issue here. The rationale of our prior cases on this issue of the destruction of property by municipal officials when it's abandoned because the policy of retrieval has not been complied with. There's another case... I don't see that line of new Supreme Court cases as having any effect on the abandonment rationale of all of our prior cases. That's not what the Fourth Circuit said when they were applying Tyler v. Hennepin County in the case that came out after briefing was done in this case called Todman v. Mayer, which is cited in the next case that we're working on. Well, now you've shifted to Tyler. That's a takings clause. I'm really having trouble with you. You've now shifted to Tyler, which is a takings clause case, not a Fourth Amendment case. But it was a takings case, but it applied the abandonment argument. The municipality argued in Tyler that we told them if they don't pay their taxes, they're going to lose their property. And they didn't pay their taxes, so therefore they lost their property. They abandoned their property. And this court in Kelly-Lomax and Conyers said, well, you abandoned your property because the sheriff told you you had 30 days or 45 days or 60 days to come retrieve your property. That's the same as Tyler. The principle is that you can't tell somebody you're going to forfeit your property if you don't pick it up within 60 days. That's not the same as an intelligence-knowing waiver and abandonment. I'm still asking, though, when under the Fourth Amendment does the constitutional harm happen? Looking at, you said there's a fourth, a fifth, and a fourteenth. So just looking at the Fourth Amendment, where is the violation or when is the violation? In this case, it happens when the sheriff destroys the property. So under the fourth and the fifth, it is when the property is destroyed. That's right. I think there would be different damages for the Fourth Amendment and for the Fifth Amendment. But we're not at that point yet. If we go back and look at the historical record of sheriffs who seize property, there's an understanding that they would hold on to it and take good care of it. Many of those cases are difficult to cite because they involve capturing of slaves. And it was viewed by the person who wanted to retrieve the slave, that the sheriff has to take good care of my property because it will diminish in value. And there are many states that still follow this rule that the police department of a sheriff who holds property that's seized is the constructive bailey or even an involuntary bailey. But we're not pressing that in this case. In this case, we're pressing that there's no rational basis for the sheriff's policy. There's no running out of storage space like there was in, as the court viewed it, in Conyers and Kelly-Lomax and Wilson v. Evanston. This is the Department of Corrections. But before we can get to the rational basis, we have to have either looking at Lee a constitutional violation or we have to have or there has to be some representation that state process is not available. Well, I'm not sure if state process being available is still valid after the takings claim, which says you don't need state process when there's a taking. You just have a taking and you could go back. That's the Nick v. Township v. Scott case. But you don't need it. You don't have to worry about whether you've exhausted state remedies or tried to get your property back. But one of the property rights cases— Do we still need a constitutional violation? The constitutional violation is if we go look at one of the cases cited in Kelly-Lomax, Philip v. Washington Legal Foundation. That's a case which involved lawyer Iolta accounts. And the question was, who got the interest? And that was a taking, as the Supreme Court viewed it. And they said that the taking was by the result of the state law that says you don't keep the interest. I'm not sure if I'm getting clear in all this, but our basic position is that there needs to be a rational basis before the government can seize and destroy property. And without a rational basis, adopting a forfeiture statute is arbitrary and unlawful in itself. And the forfeiture statute that the sheriff applies is contrary to Tyler v. Hennepin County. If there are no further questions, I'd like to reserve the rest of the time. That's fine. Thank you. Ms. Wasserman. May it please the court. This is a case about abandoned property. The district court properly granted summary judgment on plaintiff's due process claim because it is undisputed that plaintiff had adequate notice and opportunity to retrieve his property. The district court also did not abuse its discretion in denying class certification because plaintiff did not satisfy the requirements of Rule 23A. And as a preliminary matter, in this briefing, plaintiff only brings a substantive due process claim. I know there were some questions about the Fourth Amendment, the takings clause as well, that come up in the next case. I'm happy to answer those questions as well, but I'm only planning to address substantive due process because those other issues have been forfeited in this case. Before we get there, why not just ship the government IDs to the Illinois Department of Corrections? So in this case, again, plaintiff was given twice. He signed two forms, property retrieval forms, understanding that his property would be destroyed if he didn't take action. So the government had no reason to think plaintiff even wanted the property. So even assuming it's a minimal cost to ship the property, there's no reason to ship property that has been abandoned and that the government has no indication that anyone wants, which is the case. I guess just to drill down, why aren't government IDs transferred to the Department of Correction? What is the basis for that? What is the rational, I mean, what is the basis for it? So I think, again, as was raised in Conyers, Kelly-Lomax, there's the concept of, you know, there being limited space to store all of this property. I'm not talking about all of the property. I want to know why government IDs. So, again, I think the concept of this case involves government IDs, but in terms of just storing the property generally, it's not separated that way. So, you know, while one ID in this case, you know, doesn't take up much space, we have to think of it in terms of policies that affect the entire Cook County Department of Corrections. And, again, you know, it's not in the record in this case, but there's a policy at the Illinois Department of Corrections where detainees have the ability to get a license upon leaving the Illinois Department of Corrections. So, again, I think it just comes down to the fact that unless they are told that there is some reason that the individual wants this document, there's no rationale for them to, you know, go through the effort of transporting it. And so the Department of Corrections has made it clear that they are willing to receive government-issued IDs, and there's some property that goes with the individual being transferred. Correct. Yeah, so they're willing to accept the property. At the time of this lawsuit, the policy wasn't to shift the property. And, again, I'll just reiterate that, you know, so there is a rational basis, of course, for the policy, but, again, even before reaching rational basis, we'll just stress that, here, plaintiff hasn't stated a fundamental right that would even implicate substantive due process. So I think he seems to believe that, you know, if the policy is irrational, it's necessarily constitutional. But as this Court's made clear in its prior cases, first it's necessary to state a fundamental right that implicates due process. That's for unenumerated rights theory. This is property. This is not a Glucksberg claim. So while, you know, this Court has made clear that property is a fundamental right, abandoned property is different, and that's something that this Court recognized in Kelly-Lomax. So, again, it's our position here that there's no dispute that the property was abandoned. Plaintiff had, you know, two opportunities. He signed two property retrieval forms indicating that the property would be destroyed. He doesn't plead anything in his complaint stating that he made any effort to retrieve the property. In his deposition, he states that he didn't designate anyone to pick up the property. He never says that's because he couldn't do it. There's just no reason that he's given to contradict that abandonment analysis here. And I can also briefly address plaintiff talks about class certification in his brief. Just briefly, defendants did not waive numerosity below. There's an entire section of the brief titled numerosity. Plaintiff also doesn't actually dispute the fact that he didn't establish numerosity. He only takes issue with the fact that the district court, he says, did its own analysis. But, again, case law makes clear that even if the defendant had acquiesced to the plaintiff's arguments, the district court does not simply accept that numerosity or the other requirements of Bill 23A are established. And here plaintiff made, as the district court said, almost no showing that numerosity was established. He submits 42 declarations, but only two fall in the proposed class period. The declarations don't show that those individuals wanted IDs and weren't transferred with them. So if this court has no further questions, we ask that you affirm the decision of the district court. Thank you. Mr. Flaxman, anything in rebuttal? I am having trouble hearing, and I tried very hard to hear what everybody was saying. I didn't hear anything, and I don't want to be misstating what I heard, but I didn't hear any explanation of what the rational basis was for not sending the government-issued ID to the IDOC. I heard something about not separated that way. If we expanded the record, it would show that the arresting agency takes the ID and puts it in a pocket inside the inventory bag, and that's sent to the jail, and the jail then takes out of the inventory bag the things that the prisoner is allowed to have, but just can't be bothered, apparently, to take out the government-issued ID and throws it away. If the state tells you—excuse me, the sheriff tells you that, well, they can get a new ID. There's a policy at IDOC that lets people get new state IDs. That doesn't give somebody a new birth certificate, a new Social Security card, and it's not the same as having yours. It's something you have to go through. That is not—there's no reason to it. We talked a little bit about state law, but state law, as we know since Board of Regents versus Roth, is the existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law. The state law here is that IDOC will hold onto state IDs, and the sheriff still hasn't been able to articulate in response to pretty direct questions why he doesn't want to send those IDs to the prison. It's not enough, I submit, to say, well, he could have gotten somebody to go pick up his state ID for him. He didn't have to. He didn't want it because he didn't hire someone to go pick up his ID. He didn't have to do that. It was his. The sheriff had an obligation to hold it while he was there and to send it to IDOC when he left. We talked about class certification. That's only an issue that should be reached if you're going to reverse on the underlying issue, and I think there's no disagreement that there are 40,000 people in the class period. We produced affidavits from 42 people who, and 39 said, I had state ID or government-issued ID when I went to the jail, and for the sheriff to say that's not enough to assume that there's more than 40 people out of those 40,000 who had state IDs. And, well, even though there was the heading about numerosity, I think we set it out in the brief. Nothing in there speaks to state ID. That's directed at the property claim for which we, that's been abandoned. Thank you. Thank you. Thanks to both counsel. The case is taken under advisement and hold your seats because we'll call the.